**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANNE REILLY, | ) | |
| | ) | |
| Debtor/Appellant, | ) | |
| | ) | |
| v. | ) | 25 C 10634 |
| | ) | |
| CHARLES BARKLEY, | ) | |
| | ) | |
| Appellee. | ) | |

## <u>MEMORANDUM OPINION</u>

**CHARLES P. KOCORAS, District Judge:**

Dr. Anne Reilly ("Anne") and her husband, John Reilly ("John") (together, "the Reillys"), filed a joint petition for relief under Chapter 7 of the Bankruptcy Code ("Code") in the Bankruptcy Court for the Northern District of Illinois. In an adversary proceeding in the bankruptcy court, creditor Charles Barkley objected to the discharge of the Reillys' debts, claiming the Reillys knowingly and fraudulently failed to disclose material transfers and gifts in their Statement of Financial Affairs ("SOFA"). Following a bench trial, the bankruptcy court concluded that the Reillys' deliberate failure to disclose gifts and transfers amounted to false oaths under 11 U.S.C. § 727(a)(4) and denied discharge as to both John and Anne. Anne alone appeals that ruling. Because the bankruptcy court's denial of discharge was not clearly erroneous, its decision is affirmed.

## **BACKGROUND**

In 2018, the Reillys executed a note in favor of Appellee, Charles Barkley, to finance a business enterprise. The Reillys failed to repay the note and, after litigation in the Circuit Court of Cook County, Illinois, a judgment was entered in favor of Barkley on April 9, 2021. Shortly thereafter, Barkley served the Reillys with citations to discover assets. On July 25, 2023, after about two years of discovery, the circuit court entered an order for turnover requiring the Reillys to turnover various assets to Barkley.

On September 5, 2023, the Reillys filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. In connection with their petition, the Reillys also filed their required schedules and SOFA. In 2024, Barkley filed an adversarial complaint seeking an order denying discharge of both debtors under 11 U.S.C. §§ 727(a)(4)(A) and (a)(5). A bench trial was held on August 5, 2025. Anne's trial testimony was focused on a series of Zelle transfers to her daughters totaling around $15,000, a $25,000 transfer to Transamerica, and a $10,000 transfer to her mother, Lynn Huedepohl. None of these transfers were listed on the SOFA.

Regarding the transfers to her daughters, Anne testified that in February 2022, she made six $1,000 Zelle transfers to her daughter K to "clear out accounts" she believed Barkley would freeze. She testified that she made the transfers specifically so Barkley could not freeze her account. Anne stated she did not consider these Zelle

2

transfers gifts "because it was a temporary measure to get my funds out of my account before that account was frozen." A1357.[1] "Some" of the amounts were directly repaid, and some were used for "family expenses." A1357.

On February 6 and 7, 2022, Anne transferred a total of $7,000 to K. Anne testified that the $6,000 transfer was for K's tuition, and the $1,000 transfer was for books. She testified that she did not normally pay her children's tuition, but, although her children work, they don't make much money and occasionally run short. At the citation hearing, though, Anne had testified that she did not pay any of her children's tuition. At trial, Anne explained away this inconsistency by characterizing it as "a simple oversight"; she had forgotten about it. A1360. Anne testified that she "probably" asked K to pay her back when she could.

Also on February 6, 2022, Anne transferred $2,000 to her daughter M. Anne testified she did not recall what the payment was for. In her answer to the adversary complaint, however, she said it was "repair related" and that she "probably" asked for repayment if her daughter was able, although she never received repayment. A1364–65. Anne stated that she did not list the transfers on the SOFA because she "did not consider them as anything other than ordinary business expenses for a parent's responsibility." A1347. John testified that "very little [of the money transferred to their daughters] was repaid." A1430.

---

[1] "A" refers to the record on appeal, Dkt. ## 9-1 and 9-2.

Anne further testified that she was the owner of a Transamerica 403(b) account which had a loan balance of over $35,000 as of September 2022. On November 29, 2022, John paid Transamerica $25,000 in two cashier's checks to pay down the loan. Anne maintained that John made the payment without her knowledge, because he spoke to Transamerica about the payments outside of her presence. There were two phone calls with Transamerica, and on both calls, Anne authorized John to speak with the Transamerica representative. In one call, Anne wanted John to talk to Transamerica "about how we can help pay down the loans[.]" A1406. Anne claimed she left the room after authorizing John to speak with Transamerica, thinking the conversation would result in nothing more than the usual payment amount. Anne testified she only learned of the loan payoff when one of her regular payments was returned to her.

With respect to the $10,000 payment to Huedepohl, Anne testified she didn't know her husband had taken a loan from Huedepohl. It's unclear when she learned about the loan. She was not aware that John had paid Huedepohl any funds in the one year prior to filing bankruptcy. John testified that Anne had no knowledge of the money Huedepohl lent him, despite her signature on the loan check as trustee of Heudepohl's trust,[2] and no knowledge of the $10,000 payment.

On August 26, 2025, the bankruptcy court entered a judgment order denying the Reillys' discharge under Section 727(a)(4)(A) based on findings that the Reillys

---

[2] Anne explained that she would often sign blank checks for her mother.

knowingly and fraudulently failed to disclose material transfers and gifts in their SOFA. More specifically, in denying the Reillys discharge, the bankruptcy court determined the SOFA failed to list at least the following: (1) the transfers to the Reillys' daughters totaling $15,000; (2) the $25,000 Transamerica payment, and (3) the $10,000 transfer to Huedepohl. The bankruptcy court observed that both the Reillys "were angry, defensive and frustrated by the discovery process during the Citation proceedings and the adversary complaint filed by Barkley," and noted that the Reillys are well-educated professionals who signed the SOFA indicating that they were making the answers truthfully and under penalty of perjury.[3] Case No. 24-00184, Dkt. # 27, at 4 (Bankr. N.D. Ill. Aug. 26, 2025). The bankruptcy court concluded that the Reillys "made a series of false statements [and omissions] by deliberately not disclosing gifts and transfers," the "cumulative effect" of which evidenced "a reckless disregard for the truth sufficient to support a finding of fraudulent intent under [Section] 727(a)(4)." *Id.* This appeal by Anne ensued.

## **LEGAL STANDARD**

"District courts have jurisdiction to review decisions of the bankruptcy court pursuant to 28 U.S.C. § 158(a)." *In re Altheimer & Gray*, 393 B.R. 603, 606 (N.D. Ill. 2008). When adjudicating bankruptcy appeals, this Court applies "a dual standard of review: the [b]ankruptcy [c]ourt's findings of fact are reviewed for clear error, while its

---

[3] Anne holds a PhD from Northwestern University and is a professor at Loyola Quinlan School of Business.

conclusions of law are reviewed *de novo.*" *Id.* "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Rose v. Pavletich*, 621 B.R. 227, 229 (N.D. Ill. 2020). "Whether a debtor possessed the requisite intent to defraud is a question of fact, which is subject to the 'clearly erroneous' standard of review." *In re Kempff*, 847 F.3d 444, 449 (7th Cir. 2017) (quoting *In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015)).

## DISCUSSION

The issue[4] on appeal is whether it was clearly erroneous for the bankruptcy court to find that Anne made a false oath with intent to deceive when she failed to include the transfers to her daughters in her SOFA when the uncontroverted evidence showed that Barkley learned of the transfers in state court months before the bankruptcy filing.

"An oft-repeated phrase in bankruptcy is that discharge 'is reserved for the honest but unfortunate debtor.'" *Chlad v. Chapman*, 2018 WL 4144627, at *5 (N.D. Ill. 2018), *aff'd sub nom. In re Chlad*, 922 F.3d 856 (7th Cir. 2019) (quoting *Kempff*, 847 F.3d at 447). Section 727(a) of the Code "den[ies] the privilege of discharge to dishonest debtors." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). As relevant

---

[4] Anne's opening brief also purports to raise a second issue: whether it was clearly erroneous for the bankruptcy court to find that Anne was served with a citation to discover assets in the circuit court and as a result was barred from making transfers to her daughter. *See* Dkt. # 11, at 22. However, Anne develops no substantive argument as to this point and therefore the Court deems the argument waived. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

6

here, Section 727(a)(4)(A) provides that a debtor is ineligible for a discharge where "the debtor knowingly and fraudulently" makes "a false oath or account" in connection with their bankruptcy case. 11 U.S.C. § 727(a)(4)(A).

To prevail on a false oath claim, a party opposing a discharge must show, by a preponderance of the evidence, that: "(1) the debtor made a statement under oath, (2) the statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement was material to the bankruptcy proceeding." *Kempff*, 847 F.3d at 449 (internal quotations omitted). "In bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Stamat*, 635 F.3d at 978 (internal quotations omitted).

Again, the Court is tasked with determining whether the bankruptcy's conclusion that Anne acted with the requisite fraudulent intent to deceive was clearly erroneous. Fraudulent intent can be established either by showing that the debtor knowingly intended to defraud or engaged in behavior demonstrating a reckless disregard for the truth. *Kempff*, 847 F.3d at 449; *Stamat*, 635 F.3d at 982. A reckless disregard for the truth is "not caring whether some representation is true or false . . . ." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). Fraudulent intent is a factual question left for the bankruptcy judge, with the judge considering the debtor's "'whole pattern of conduct.'" *In re Ratner*, 132 B.R. 728, 731 (Bankr. N.D. Ill. 1991) (quoting *In re Reed*, 700 F.2d 986, 991 (5th Cir. 1983)); *see also In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) ("The bankruptcy court's finding of fraudulent intent may be based on inferences drawn

7

from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances." (citations omitted)); *Chlad*, 2018 WL 4144627, at *9 ("[A] pattern or series of false statements may be used to establish a reckless disregard for the truth.").

As an initial matter, Anne's argument that Barkley's awareness of the transfers to Transamerica and the Reillys' daughters forecloses any finding of fraudulent intent falls flat. Barkley's knowledge is irrelevant. It is the debtor's duty to accurately disclose all transfers, assets, and other relevant information; Barkley's knowledge of the transfers did not relieve the Reillys of this duty. *See In re Henley*, 480 B.R. 708, 794–95 (Bankr. S.D. Tex. 2012) (rejecting the debtors' argument that a creditor knew about a property transfer so they could not have had any fraudulent intent in failing to disclose the transfer, stating "the Debtors' failure to disclose the transfer . . . violated their duty to the Trustee and all of their other creditors (who did not have the knowledge that [one creditor] held). What [that one creditor] knew is beside the point."); *see also In re Kerr*, 2017 WL 3880875, at *8 n.10 (Bankr. N.D. Ohio 2017) ("The knowledge of creditors about undisclosed assets does not obviate a debtor's duty to fully disclose all required information." (citing *In re Henley*, 480 B.R. at 794–795)); *Lardas v. Grcic*, 847 F.3d 561, 570 (7th Cir. 2017) (plaintiff does not need to demonstrate "an affirmative detriment" to creditors to support an objection to discharge, for the "successful functioning of the Bankruptcy Code hinges both upon the bankruptcy's veracity and his willingness to make a full disclosure." (internal quotations omitted)).

The fraudulent intent aspect of Section 727(a)(4) focuses on the debtor's mindset, not the creditor's knowledge. *See Chlad*, 922 F.3d at 862.

Anne claims she had no knowledge of John's payments to Transamerica and Heudepohl and urges the Court to accept her testimony as true because it is uncontradicted. But "the Court need not accept a party's self-serving testimony simply because it is unopposed." *In re Bennett*, 2004 WL 3244579, at *4 (Bankr. M.D. La. 2004) (citing *Lerch v. Comm'r of Internal Revenue Serv.*, 877 F.2d 624, 632 (7th Cir. 1989)); *see also In re Nora*, 581 B.R. 870, 879 (Bankr. D. Minn. 2018) ("A court is not required to accept the testimony of a witness at face value if the testimony is implausible or not credible in view of the totality of the surrounding circumstances.").

The record before the bankruptcy court revealed that Anne authorized John to speak with Transamerica on two separate occasions. In one call, Anne specifically wanted John to talk to Transamerica "about how we can help pay down the loans[.]" A1406. In another call, she told Transamerica that John "wants to help me pay down the loan." A1410. Anne claimed she left the room after authorizing John to speak with Transamerica, apparently thinking the conversation would result in nothing more than the usual payment amount. If that were true—that she believed John would merely be making a standard payment—what was the purpose of the call? One fairly obvious conclusion that can be drawn from Anne's part of the conversation with Transamerica is that the Reillys were looking for an alternative solution to pay down the loan, something more than simply making the standard monthly payments. Given that aim,

it seems unlikely that Anne would not have asked her husband for the details of the calls—whether he worked out some sort of arrangement with Transamerica, if he made a payment or planned to make a payment, and if so, the amount of that payment. After all, the loan was in her name.

The Seventh Circuit has held that, "in recognition of the ringside view that the bankruptcy court occupies in making the intent determination, 'where the evidence on the intent question is such that two permissible conclusions may rationally be drawn, the bankruptcy court's choice between them will not be viewed as clearly erroneous.'" *Chlad*, 922 F.3d at 861 (quoting *In re Krehl*, 86 F.3d 737, 744 (7th Cir. 1996)). The Court finds that to be the case here and declines Anne's invitation to reassess the credibility of her trial testimony. *See Kempff*, 847 F.3d at 449 ("[B]ecause an 'intent determination often will depend upon a bankruptcy court's assessment of the debtor's credibility,' the reviewing court's deference to the bankruptcy judge's ruling is particularly strong in this context." (quoting *Krehl*, 86 F.3d at 743)).

Additionally, "[g]uidance from the Seventh Circuit indicates that when considering whether a debtor's actions rise to the level of reckless disregard, the debtor's level of education and business experience should be considered." *In re Garcia*, 586 B.R. 909, 921 (Bankr. N.D. Ill. 2018) (citing *Stamat*, 635 F.3d at 982; *see also In re Schryver*, 558 B.R. 856, 871 (Bankr. N.D. Ill. 2016) ("In determining whether a debtor has shown reckless indifference to the truth, the court may consider the debtor's level of education and experience.")). The bankruptcy court observed that Anne was a

10

"well-educated professional[]," noting that she holds a PhD from Northwestern University and is a professor at Loyola Quinlan School of Business. Anne testified that she transferred $6,000 to her daughter for the express purpose of keeping those funds out of Barkley's reach. "This is not a scenario in which a debtor had little familiarity with her financial affairs, left business affairs to others, or took care to ensure complete and accurate disclosures only to learn after the fact of an isolated mistake or two." *Chlad*, 922 F.3d at 861.

Anne also argues that the bankruptcy court mistakenly conflated John's failings with her "single failure to list the transfers to her daughters." Dkt. # 11, at 15. It's true the bankruptcy court order doesn't explicitly spell out whether the bankruptcy judge considered Anne as equally culpable as John with respect to the Transamerica or Huedepohl payments. But even if the bankruptcy court considered the failure to list the transfers to the Reillys' daughters to be Anne's sole offense, a false statement is a false statement. The bankruptcy court's conclusion that Anne acted with fraudulent intent and that her failure to list the transfers to her daughters was not the result of mistake or inadvertence, is not clearly erroneous.

## **CONCLUSION**

For the foregoing reasons, the Court affirms the bankruptcy court's order in all respects.  Civil case terminated.

It is so ordered.

Charles P. Kocoras
United States District Judge

Dated: 4/8/2026